**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RAMON LOPEZ,<br>*Petitioner*,<br><br>v.<br><br>ANGEL QUIROS,<br>*Respondent*. | )<br>)<br>)<br>)<br>)<br>)<br>) | 3:22-CV-565 (SVN)<br><br><br><br><br><br>September 29, 2026 |

**RULING ON PETITIONER'S AMENDED PETITON FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

Sarala V. Nagala, United States District Judge.

Petitioner Ramon Lopez, who is presently incarcerated at Cheshire Correctional Institution,[1] has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that several of his constitutional rights were violated during the criminal trial that resulted in his October 2003 conviction for murder, attempted murder, and assault in the first degree. Specifically, Petitioner's live allegations include that (1) his Fourteenth Amendment right to due process and a fair trial was violated by the prosecution's failure to disclose material exculpatory evidence; (2) his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated by trial counsel's failure to investigate and pursue certain defenses; (3) his Fourteenth Amendment right to due process and a fair trial was violated by the prosecution's presentation of false testimony; and (4) his Sixth and Fourteenth Amendment rights to counsel were violated at sentencing when the trial court denied a requested continuance after substitute counsel was appointed. *See* Am. Pet., ECF No. 29 ¶¶ 77–121.[2] Respondent Angel Quiros, the Commissioner

---

[1] *See* Connecticut Department of Correction, Inmate Locator, https://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=227089 (last visited September 29, 2026).

[2] Petitioner had also alleged that his Fourteenth Amendment right to a fair trial was violated by prosecutorial misconduct, ECF No. 29 ¶¶ 123–125, but he has withdrawn this claim in his habeas traverse. *See* Traverse, ECF No. 38 at 40.

of the Connecticut Department of Correction ("DOC"), asserts that the petition should be denied because the determinations that state courts made when they denied Petitioner habeas relief were not contrary to or an unreasonable application of clearly established federal law. Opp. to Pet., ECF No. 34.

For the reasons stated below, the Court agrees with Respondent. Accordingly, the petition is DENIED.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Petitioner's Conviction and Sentencing

On October 1, 2003, following a jury trial, Petitioner was convicted of murder under Conn. Gen. Stat. § 53a-54a(a), two counts of attempted murder under Conn. Gen. Stat. §§ 53a-49(a) and 53a-54a(a), and two counts of assault in the first degree under Conn. Gen. Stat. § 53a-59(a)(5). ECF No. 29 ¶ 2. The present habeas petition seeks to vacate these convictions and the associated sentence. *Id.* ¶ 126.

In considering Petitioner's direct appeal from these convictions, the Connecticut Supreme Court set forth the following facts that a jury could have reasonably found. *State v. Lopez*, 280 Conn. 779, 783 (2007). On February 2, 2002, in the early morning hours, a shooting occurred in front of Pettway's Variety Store ("Pettway's") in Bridgeport, Connecticut. *Id.* at 783–84. The three victims—Shariff Abdul-Hakeem, also known as "Polo"; his brother, Manuel Rosado[4]; and Gary Burton—were standing outside Pettway's when two men, Lou Diamond and a man nicknamed Chef, came out of Pettway's, "gave Abdul-Hakeem and Rosado a 'grim' look" and walked away. *Id.* at 783. Shortly thereafter, Diamond and Chef turned back toward Pettway's

---

[3] The Court apologizes to the parties for the delay in issuing this ruling, which it understands is substantial.

[4] Mr. Rosado is alternatively referenced throughout the record as "Manuel," "Manwel," "Emmanuel," and "Manual." The Court will refer to him by the name "Manuel Rosado."

with their faces partially covered, and a third unidentified person carrying a gun crossed the street to join them. *Id.*

Meanwhile, a white car approached the intersection where Pettway's was located, and two men got out of the back seat. *Id.* Although the two men had covered the bottom halves of their faces, an eyewitness named Tony Payton knew these men and identified them as Boo McClain and Petitioner. *Id.* at 783–84. Petitioner carried a shotgun while McClain carried a handgun. *Id.* at 784. As Petitioner and McClain approached Pettway's, Petitioner stated to the people on the sidewalk, "All right freeze, nobody move," and then cocked the shotgun, at which point the people gathered on the sidewalk rushed toward Pettway's and banged on the door, which was locked, to be let inside. *See id.* at 784. Rosado, who was still standing outside Pettway's, turned to see the commotion and saw Petitioner, whom he had known for about a year before the shooting and with whom he had previously been incarcerated, aiming a gun at him. *Id.* He "dove" for the door at Pettway's, and Petitioner, McClain, Diamond, Chef, and the third unidentified man "opened fire on the crowd." *Id.* After the shooting stopped, Petitioner yelled, "I told you I was going to get you, Polo, I told you I was going to get you." *Id.* McClain and Petitioner then ran to get back into the white car they had arrived in, while Diamond and Chef retreated on foot in the direction they had come. *Id.* A ballistics analysis later determined that four handguns and two shotguns were used in the shooting. *Id.*

As a result of the shooting, Abdul-Hakeem was struck with two bullets—one in his calf, and one that entered through his left buttock and exited the right side of his abdomen. *Id.* He later died from uncontrollable bleeding caused by the bullet wounds. *Id.* Rosado received shotgun wounds to his legs, and Burton was wounded when a bullet hit his ribs and grazed his hip. *Id.*

Following a jury trial, Petitioner was found guilty of the murder of Abdul-Hakeem, the attempted murder of Rosado and Burton, and assault in the first degree of Rosado and Burton. *Id.* Rosado testified against Petitioner at the trial. *Id.* at 793–94. After the verdict, the trial court granted Petitioner's motion to dismiss his trial counsel and appointed substitute counsel. *Id.* at 785. Substitute counsel moved to continue Petitioner's sentencing until a date after the trial transcript would be available, arguing that he needed to review the transcript in order to address Petitioner's complaints about his trial counsel and "determine whether he should file a motion for a new trial." *Id.* The trial court denied the motion, reasoning first that the date to file any motion for a new trial had already passed, and second that the purpose of a sentencing hearing was not to determine the adequacy of trial counsel. Rather, the court stated, although "a transcript of the trial may be necessary on appeal of [Petitioner's] conviction or for a proceeding before a habeas court, it is not necessary for effective representation of [Petitioner] at a sentencing hearing." *Id.* (internal quotation marks omitted). Thereafter, Petitioner was sentenced to a total effective term of one hundred years of imprisonment. *Id.* at 786.

B. <u>Direct Appeals and Habeas Proceedings</u>

Petitioner directly appealed to the Connecticut Supreme Court, where he raised the following arguments: (1) the trial court improperly denied substitute counsel's motion to continue the sentencing, *see id.* at 786–93; (2) the trial court improperly admitted evidence of Petitioner's prior misconduct, *see id.* at 793–97; (3) the state prosecutor engaged in several instances of misconduct in violation of due process, *see id.* at 797–807; (4) there was insufficient evidence to establish his guilt beyond a reasonable doubt, *see id.* at 807–20; and (5) the trial court improperly instructed the jury on accessory liability, *see id.* at 820–23. The Connecticut Supreme Court rejected each of the five claims and affirmed the judgment of the trial court. *Id.* at 823.

While his direct appeal was pending, Petitioner filed his first state habeas petition. *Lopez v. Comm'r of Corr.*, No. TSR-CV05-4000857-S, 2012 WL 234150, at *1 (Conn. Super. Ct. Jan. 4, 2012) ("*Lopez I*"). The state habeas court acknowledged that the petition, which had been amended multiple times, contemplated "several claims," but reasoned that the evidence presented at the habeas trial focused on Petitioner's contention that his criminal trial counsel was unconstitutionally ineffective by failing to present an alibi defense. *Id.* The state habeas court denied the petition, finding that defense counsel made the correct strategic judgment in not pursuing Petitioner's "weak[]" alibi theory. *Id.* at *8. The Connecticut Appellate Court affirmed, *Lopez v. Comm'r of Corr.*, 150 Conn. App. 905 (2014) (*per curiam*) ("*Lopez I App.*"), and the Connecticut Supreme Court denied certification to appeal, *Lopez v. Comm'r of Corr.*, 314 Conn. 922 (2014).

While the appeal of his first state habeas petition was pending, Petitioner filed his second state habeas petition. *Lopez v. Warden*, No. TSR-CV12-4004836-S, 2019 WL 2369528, at *1 (Conn. Super. Ct. May 1, 2019) ("*Lopez II*"). Petitioner's second state habeas petition raised the following arguments: that the prosecutor failed to disclose certain evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *id.* at *6–9; that Petitioner's trial counsel was unconstitutionally ineffective, *id.* at 9; that Petitioner's previous habeas counsel was unconstitutionally ineffective by failing to prove that his criminal trial counsel was unconstitutionally ineffective, *id.* at 9–17; and that he was actually innocent, *id.* 17–23. The state habeas court denied the second petition. *Id.* at *23. The Connecticut Appellate Court affirmed and adopted this ruling, *Lopez v. Comm'r of Corr.*, 208 Conn. App. 515, 517 (2021) ("*Lopez II App.*"), and the Connecticut Supreme Court denied certification to appeal, *Lopez v. Comm'r of Corr.*, 340 Conn. 922 (2022). The Court discusses the *Lopez II App.* decision further below.

Thereafter, in April of 2022, Petitioner, proceeding *pro se*, filed the present federal habeas petition pursuant to § 2254. Pet., ECF No. 1. In his initial petition, he raised eight grounds for habeas relief. Respondent subsequently moved to dismiss on the ground that the petition was "mixed," or contained both exhausted and unexhausted claims. Mot. to Dismiss, ECF No. 12 at 1. In a ruling on the motion to dismiss, this Court permitted Petitioner to proceed only on the exhausted claims. *Lopez v. Quiros*, No. 3:22-CV-565 (SVN), 2023 WL 2384112 (D. Conn. Mar. 6, 2023).

After that ruling and following the appointment of *pro bono* counsel, Petitioner filed an amended petition reflecting only the following exhausted claims: that (1) his Fourteenth Amendment right to due process and a fair trial was violated by the prosecution's failure to disclose exculpatory material; (2) his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated by trial counsel's failure to investigate and pursue certain defenses; (3) his Fourteenth Amendment right to due process and a fair trial was violated by the prosecution's presentation of false testimony; (4) his Sixth and Fourteenth Amendment rights to counsel were violated at sentencing when the trial court denied a requested continuance after substitute counsel was appointed; and (5) his Fourteenth Amendment right to a fair trial was violated by prosecutorial misconduct. *See* ECF No. 29 ¶¶ 27–121. Through the briefing of the amended petition, however, Petitioner explicitly withdrew his fifth claim, leaving only claims one through four pending. ECF No. 38 at 40.

## II. LEGAL STANDARD

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Under § 2254(d), a habeas application "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This deferential standard of review is commonly referred to as "AEDPA deference," referring to its establishment as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.

A. Contrary To/Unreasonable Application of Clearly Established Federal Law

A state court's decision is "contrary to" clearly established federal law if, for example, "the state court applies a rule that contradicts the governing law set forth" by the U.S. Supreme Court, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the U.S. Supreme Court] and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *see also Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002).

A state court's decision is an "unreasonable application" of clearly established law where the court "identifies the correct governing legal principle from [the U.S. Supreme Court's decisions] but unreasonably applies that principle to the facts of the prisoner's case[.]" *Williams*, 529 U.S. at 413. "In order for a state court's decision to be an unreasonable application of [the U.S. Supreme Court's] case law, the ruling must be objectively unreasonable, not merely wrong . . . In other words, a litigant must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (citations

and internal quotation marks omitted). This is "'meant to be' a difficult standard to meet." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

To determine whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law, the federal habeas court must first define the relevant federal law. *See Kennaugh*, 289 F.3d at 42 ("The threshold inquiry under AEDPA is whether the petitioner 'seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.'" (quoting *Williams*, 529 U.S. at 390)). "For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the U.S. Supreme Court] refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 412). Those holdings "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh*, 289 F.3d at 42.

Importantly, under AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions only of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, 574 U.S. 1, 6–7 (2014) (holding AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established"); *Johnson v. Quiros*, No. 3:24-CV-01847 (KAD), 2026 WL 92190, at *3 (D. Conn. Jan. 13, 2026) ("Because clearly established federal law must come from the Supreme Court, 'circuit precedent does not constitute clearly established Federal law.'") (quoting *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (internal quotation marks omitted)). Indeed, circuit precedent may not be used to "to refine or sharpen a

general principle of Supreme Court jurisprudence into a specific legal rule that [the U.S. Supreme Court] has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B. Unreasonable Determination of Facts

A petitioner must meet a similarly stringent standard to demonstrate that a state court has made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A "'state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Cardoza v. Rock*, 731 F.3d 169, 178 (2013) (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)). Similarly, the fact that "'[r]easonable minds reviewing the record might disagree' as to the relevant finding" is insufficient to "supplant the state court's factual determination." *Id.* (quoting *Rice v. Collins,* 546 U.S. 333, 341–42 (2006)). Rather, a factual determination may be unreasonable where "reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding," or "where the court ignored highly probative and material evidence." *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) and *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)).

The standard for federal habeas relief under § 2254 is "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citation and internal quotation marks omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation and internal quotation marks omitted).

The Court discusses each of Petitioner's claims in turn.

## III. FIRST CLAIM: POTENTIAL *BRADY* VIOLATION

The Court first rejects Petitioner's contention that he is entitled to habeas relief because the State improperly failed to disclose exculpatory and impeachment evidence related to a prior crime that Petitioner contends was connected to his crime of conviction. For the reasons below, Petitioner's request for habeas relief as to his *Brady* claim is denied.

### A. Additional Relevant Facts

The Court first recounts some additional facts to provide context for Petitioner's *Brady* claim.

#### *1. The P.T. Barnum Home Invasion*

The 2019 second state habeas court ruling denying Petitioner's *Brady* claim made the following factual and legal determinations concerning a home invasion at the P.T. Barnum apartments on January 27, 2002, which is central to Petitioner's *Brady* claim. The second habeas court made these findings, which were adopted by the Connecticut Appellate Court, after "review[ing] the evidence . . . in great detail, including transcripts of the criminal trial and the first habeas case and police investigation and interview reports pertaining to multiple incidents." *Lopez II*, 2019 WL 2369528, at *1; *see also Lopez II App.*, 208 Conn. App. at 520.

At or around 6 am on January 27, 2002, Barbie Colbert and her five children were asleep at her home located at P.T. Barnum Apartment 108, while another relative, Davis Brown, was watching television in the living room. *Id.* at 526. The front door to her apartment had been left unlocked by a neighbor earlier that morning. *Id.* Two armed men "rushed" into the apartment demanding money. *Id.* Although both gunmen had concealed the lower halves of their faces, Brown recognized one of the robbers as Jerry Kollock and believed the second armed man to be Randy Armstrong. *Id.* The man Brown identified as Kollock put a gun in Brown's mouth and ordered him to take him into Colbert's room and wake her up. *Id.* at 526–27. Brown did so;

Kollock then hit him in the head multiple times, causing him to bleed. *Id.* at 527. Colbert subsequently produced $180 for the armed men and Kollock directed his accomplice to search the apartment. *Id.* As a result of the commotion that occurred from the incident, including some screaming from the robbery victims, Colbert's teenage stepdaughter came out of her room to Colbert's room. *Id.* Kollock's accomplice then assaulted her with a gun while Kollock "probed her vagina, possibly searching for concealed drugs." *Id.*

A third accomplice, whom Brown identified as Brad Rainey, then entered the apartment and told Kollock and the second accomplice to leave. *Id.* at 528. On their way out, either Kollock or the other gunman fired a gun toward a kitchen table under which Colbert's five-year-old daughter was hiding. *Id.* As the armed men drove away, Brown and Colbert's son watched them from the window, and Brown recognized one of the cars quickly exiting the parking area as belonging to Kollock's girlfriend. *Id.* Colbert and her thirteen-year-old son also recognized Kollock, as Kollock had sought hair-braiding services from Colbert only a few weeks earlier. *Id.* Upon learning that the police suspected him to be one of the gunmen in this home invasion, Kollock "disposed [of] his pistol and went underground," but "[t]he police eventually captured him." *Id.*

2. *Marcus Mahoney's Habeas Testimony*

At the second habeas trial, Petitioner presented newly-discovered evidence in the form of testimony from an individual named Marcus Mahoney concerning both the P.T. Barnum home invasion and the Pettway's shooting. *Lopez II App.*, 208 Conn. App. at 562–64.

Mahoney testified that he, Rosado, Abdul-Hakeem, Kollock, and an individual named Tank Gethers believed that Barbie Colbert, one of the victims of the P.T. Barnum home invasion, was a major drug dealer whom they could rob. *Id.* at 563. According to Mahoney, Kollock and Abdul-Hakeem executed the P.T. Barnum robbery with guns supplied by Gethers. *Id.* Mahoney

also stated that he believed the partially-masked shooters at the Pettway's incident were Gethers, Brad Rainey, and a person Mahoney knew only as "K"—but that Petitioner was not present. *Id.* at 564. Mahoney did not convey this exculpatory information to anyone until he was interviewed by Petitioner's habeas investigator years later, after Petitioner had long since been convicted. *Id.* at 562, 564–565.

The habeas trial court, in the opinion adopted by the Appellate Court, found Mahoney's testimony to be "fraught with circumstances that expose his credibility and/or reliability to derogation," including that Mahoney bore a grudge against Rainey for shooting Mahoney in the fall of 2001 (with one of the firearms that was used in both the P.T. Barnum home invasion and the Pettway's shooting); that the Pettway's shooters were masked and that Mahoney admitted to running away when he heard gunshots, rendering identification of the shooters difficult; and that Mahoney did not come forward with the exculpatory information for years. *Id.* at 567, 562.

*3. The Robinson Report*

As noted above, the Pettway's shooting for which Petitioner was convicted occurred on February 2, 2002. The police recovered several cartridge casings in the aftermath of the Pettway's shooting. *Lopez II App.*, 208 Conn. App. at 533–534. Firearms comparison testing conducted by an examiner named Marshall Robinson revealed that two of the guns used to fire these shots were connected to a total of five previous shootings in the Bridgeport area, including the January 27, 2002, P.T. Barnum home invasion. *See id.* at 534 (identifying incident number 020122-056 as the P.T. Barnum home invasion); Ex. to Sec. State Habeas App. Br., Resp. App'x M, ECF No. 12-15 at 252 ("Robinson Report"). The State's Attorney's Office transmitted a version of the Robinson Report to Petitioner's trial counsel. *See Lopez II App.*, 208 Conn. App. at 534. The Robinson

Report contained the incident and case numbers for each prior incident in which the guns were fired, including the P.T. Barnum incident. *Id.*[5]

A second version of the Robinson Report, which appears in the Pettway's shooting police department file, also contains a handwritten notation stating the name "Marcus Mahoney," with the letter "v" in a circle and a downward arrow pointing to handwritten text stating "Now a suspect" and a second downward arrow pointing to handwritten text stating "also a suspect in Robbery." ECF No. 12-15 at 252 ("Mahoney Notes"). These Notes are discussed in detail below.

*4. The State's Disclosures and Allegedly Withheld Documents*

Petitioner claims that the State violated his right to due process when the prosecutor failed to disclose to him certain information from the P.T. Barnum home invasion police file and the Mahoney Notes, which appeared on a version of the Robinson Report. *See* ECF No. 29 ¶¶ 77–80; *clarified in* Pet'r.'s Supp. Br., ECF No. 54 at 6–7.[6] Each piece of allegedly suppressed evidence, in Petitioner's view, would have been relevant to a potential defense theory that a third party—not Petitioner—committed the Pettway's shooting, or was otherwise exculpatory or impeaching. ECF No. 29 ¶¶ 77–78. The Court describes the State's disclosures and the allegedly withheld evidence below.

[5] The second state habeas court and Appellate Court erroneously summarized the Robinson Report as reflecting that one gun used at the Pettway's shooting was used in the five prior shootings in the Bridgeport area, *id.*; the Report actually indicates that *two* guns used at the Pettway's shooting were connected to a total of five prior shootings. ECF No. 12-15 at 252.

[6] Petitioner originally presented three categories of evidence in his amended petition, ECF No. 29 ¶¶ 77–80, but later clarified that he views these three pieces of evidence as presenting two separate *Brady* claims. *See* ECF No. 54 at 6 (indicating that a third category of allegedly withheld evidence, specifically relating to Rosado's statement about his involvement in the P.T. Barnum incident, is subsumed by the first category).

a. Documents from the P.T. Barnum Police File

Petitioner contends that the police department's P.T. Barnum home invasion file was not disclosed to his trial counsel,[7] and that several documents within that police file were exculpatory and/or impeaching. *See* ECF No. 38 at 10, n.6 (identifying Exhibits 9-19, docketed at ECF No. 38-2 to 38-12, as "especially helpful"). These documents include the following:

**Rosado Statement & Accompanying Llanos Report.** On May 17, 2002, Bridgeport Police Detective Santiago Llanos obtained a handwritten statement from Manuel Rosado, one of the victims in the Pettway's shooting, related to the P.T. Barnum home invasion ("Rosado Statement"). Rosado St., Pet. Ex. 9, ECF No. 38-2. In the accompanying report, Detective Llanos stated that Rosado was "accused of taking part in [the P.T. Barnum] incident," but that Rosado stated the people actually involved in it were Jerry Kollock, Rosado's brother Sharif Abdul-Hakeem (the Pettway's murder victim), and Robert Payton. Llanos Rosado Report, Pet. Ex. 11, ECF No. 38-4 at 1. Llanos' report provides that Rosado stated he "followed Jer[ry] Kollock to P.T. Barnum, but was unaware of what was going to happen." *Id.*

In his handwritten statement, Rosado stated that he was at the P.T. Barnum apartments on a date in mid-January of 2002 around 11:30 p.m. with Rob Payton, "Jerry" (presumably Jerry Kollock), and Abdul-Hakeem. ECF No. 38-2 at 3. Rosado stated that he was waiting in or near his car at the P.T. Barnum apartments while Payton, Jerry, and Abdul-Hakeem left the various cars for a period of time and later returned. *Id.* at 3–4. Rosado remembered that Jerry and Abdul-Hakeem left first, but they were gone for longer than expected, so Payton followed to go check on

[7] The state prosecutor testified at the second habeas trial that he disclosed the P.T. Barnum file to Petitioner's trial counsel during trial. Sec. State Habeas Trial Tr., Resp. App'x PP, ECF No. 34-24 at 65–66. The P.T. Barnum file was not found in trial defense counsel's files, however. *See* Sec. State Habeas Trial Tr., Resp. App'x OO, ECF No. 34-23 at 134–36. For purposes of this ruling, the Court assumes, without deciding, that the P.T. Barnum file was *not* disclosed to Petitioner's trial counsel.

them. *Id.* at 3. Rosado stated that, after the men returned to the cars, Abdul-Hakeem appeared upset. *Id.* at 4. Rosado asked him "[what's] wrong and he said nothing[,], he just keep saying Jerry is a stupid mother fucker." *Id.* According to Rosado, Payton and Jerry were "all [h]yped and crazy looking." *Id.* Rosado then went to visit the home of a friend before returning home. *Id.*

Petitioner contends that the Rosado Statement and Llanos Rosado Report were both exculpatory, insofar as they laid the foundation for a potential third-party culpability defense for the Pettway's shooting (explained further below), and impeachment of Rosado, who testified at Petitioner's trial but who was not cross-examined about any potential involvement in the P.T. Barnum home invasion because the file was not disclosed. ECF No. 29 ¶¶ 78–79, 87.

**Brad Rainey Documents.** On February 6, 2002, Detective Llanos also interviewed Brad Rainey in connection with the investigation of the P.T. Barnum home invasion. Rainey Int., Pet. Ex. 18, ECF No. 38-11. Rainey stated that the victim of the home invasion, Barbie Colbert, believed that "Jeri" (Kollock) and "some other kid" robbed her, *id.* at 6, and that other people believed he (Rainey) had been involved, *id.* at 6–7. Rainey denied knowing anything about the home invasion. *Id.* at 16.

The next day, the Bridgeport Police Department interviewed Cedilece Davis, the mother of one of Rainey's children, who stated that she knew Rainey had not committed the P.T. Barnum home invasion because he was with her at the relevant time. Davis Int., Pet. Ex. 19, ECF No. 38-12 at 1–2.

On April 29, 2002, Detective Llanos obtained a handwritten statement from Brad Rainey and wrote an accompanying report. Llanos Rainey Report, Pet. Ex. 10, ECF No. 38-3; Rainey St., Pet. Ex. 12, ECF No. 38-5. Llanos' report stated that "Mr. Rainey was initially accused of" taking part in the P.T. Barnum home invasion, "but maintained that he was innocent," and that Rainey

stated that Kollock told him that the people who committed the home invasion were Kollock, Abdul-Hakeem, and Rosado. *Id.* at 1.

Rainey's April 2002 handwritten statement provides that Kollock told Rainey that he (Kollock), "Polo" (Abdul-Hakeem) and "Cricket" (Manuel Rosado) "were the ones who did the robbery." ECF No. 38-5 at 8. Kollock reported to Rainey that "Polo was in the room with 'Wiz' and that Cricket was outside waiting for them." *Id.*

The Bridgeport Police Department obtained an arrest warrant for Rainey for the P.T. Barnum home invasion on February 1, 2002. *See* Warrant and Application, Pet. Ex. 17, ECF No. 38-10. Petitioner states that the charges against Rainey were dropped, and he later testified against Kollock, who ultimately pleaded guilty to committing the home invasion after one day of trial. ECF No. 38 at 10 (citing Kollock Trial Tr., Pet. Ex. 20, ECF No. 38-13).

Petitioner contends that Rainey's alleged involvement in the P.T. Barnum home invasion would have helped Petitioner to mount a third-party culpability defense for the Pettway's shooting, as explained further below.

**Randy Armstrong Documents.** Finally, Petitioner contends that an individual named Randy Armstrong was suspected of participating in the P.T. Barnum home invasion, but was later "exonerated" because he was under GPS monitoring at the time of the incident, which demonstrated he was not at P.T. Barnum on the day in question. ECF No. 38 at 10–11.[8] Petitioner suggests that the police reports indicating that Armstrong could not have committed the home invasion would have been helpful to his defense, though he does not clearly explain why. *See id.*;

[8] Petitioner's habeas traverse states that "Brad" Armstrong was accused of participating in the P.T. Barnum incident but was later excluded based on GPS monitoring evidence. *Id.* Supporting documentation indicates that this individual was actually Randy Armstrong; "Brad Armstrong" is not otherwise mentioned in the habeas traverse. Cotto Report, Pet. Ex. 13, ECF No. 38-6 (referencing Randy Armstrong); Cotto Report, Pet. Ex. 14, ECF No. 38-7 (same); Parole Status Report, Pet. Ex. 15, ECF No. 38-8 (GPS monitoring report for Randy Armstrong); Parole Status Report, Pet. Ex. 16, ECF No. 38-9 (same); *but see* ECF No. 50 (Petitioner's counsel stating it was "[his] understanding" that "[t]here were two Armstrongs, but indicating that he was having trouble remembering with certainty).

ECF Nos. 38-6, 38-7, 38-8, and 38-9 (police reports related to Armstrong's potential involvement and GPS monitor).

b. The Mahoney Notes and the Robinson Report

Petitioner also contends that the version of the Robinson Report containing the Mahoney Notes was never disclosed to him, and that disclosure of the version of the Robinson Report without the Mahoney Notes did not suffice to meet the State's *Brady* obligations.

The second state habeas court, in the opinion adopted by the Appellate Court, concluded that the State disclosed the Robinson Report—apparently without the handwritten Mahoney Notes—to Petitioner's trial counsel. *Lopez II App.*, 208 Conn. App. at 534. Additionally, on September 18, 2003, two days after evidence commenced, the State filed a supplemental disclosure with the Court stating that Robinson "matched the 9 mm casings (police Exhibit #1 & 2) to a burglary that took place in Bridgeport (DB020122-056) and resulted in the arrest and prosecution of Jerri Kollock, CR02-177003. Mr. Kollock was convicted and sentenced in December, 2002." State's Supp. Disclosure, Pet. Ex. 22, ECF No. 38-15 at 1. The State filed a second supplemental disclosure on September 19, 2003, stating that "[t]he state disclosed Bridgeport PD reports (010609-036; 010429-195; 01D1739; and 01D1796), which were referenced in Marshall Robinson's report dated 2/14/02, on this date to the defendant." *Id.* at 2.

Thus, although the State produced police reports for four of the five other incidents to which the firearms were related, it appears the full P.T. Barnum police file was not disclosed to Petitioner's trial counsel. Instead, the P.T. Barnum incident was merely referenced as a "burglary that took place in Bridgeport," for which Kollock was convicted. ECF No. 38-15 at 1.

Respondent concedes that the version of the Robinson Report containing the Mahoney Notes was never disclosed to Petitioner's trial counsel. *See* Fed. Habeas Hearing Tr., ECF No. 50 at 42.

B. <u>Discussion</u>

The Court concludes that the Connecticut state courts'[9] holding that Petitioner's *Brady* rights were not violated by the prosecution during his underlying criminal case is not contrary to, or an unreasonable application of, federal law; nor was it based on an unreasonable determination of the facts.

*1. P.T. Barnum File (Category One)*

The parties agree that Petitioner's *Brady* claim was adjudicated on the merits by the state courts with respect to the evidence contained in the P.T. Barnum file. *See, e.g.*, ECF No. 54 at 6 (Petitioner's supplemental brief acknowledging the state courts adjudicated "the P.T. Barnum police file claims"); Resp.'s Supp. Br., ECF No. 53 at 13 ("The petitioner's *Brady* claim was adjudicated on the merits.") (quotation marks omitted). Thus, the Court proceeds to address this portion of Petitioner's *Brady* claim first, and concludes that federal habeas relief is unwarranted.

a. State Courts' Ruling

As described above, the Connecticut Appellate Court adopted the opinion of the second state habeas court, including its rejection of Petitioner's *Brady* claim. *See Lopez II App.*, 208 Conn. App. at 517–18 (affirming and adopting *Lopez II*). In doing so, the Connecticut Appellate Court noted that it "examined the record and considered the briefs and arguments of the parties, and conclude[d] that the judgment of the habeas court should be affirmed," as its opinion was "thorough and well reasoned" and was "a proper statement of the relevant facts and the applicable

---

[9] The Court uses the term "state courts' ruling" to refer to the second state habeas trial court's ruling, which was adopted in full by the Appellate Court. *See Lopez II App.*, 208 Conn. App. at 517–18.

law on the issues." *Id.* at 518. After making the factual findings noted above related to the P.T. Barnum home invasion, the state courts considered whether the state's failure to "disclose exculpatory connections between the evidence gathered in the P.T. Barnum Apartments home invasion and the evidence obtained concerning the Pettway store shootings" constituted a *Brady* violation. *Id.* at 533. Specifically, Petitioner contended "that it was a *Brady* violation for the state to fail to go beyond [the disclosure of the Robinson report] and also provide, without a defense request, the entire investigation file materials generated by the police with respect to the earlier shootings." *Id.* at 534.

The state courts considered the relevant evidence and concluded that the state met its *Brady* obligations. Specifically, the state courts held that the P.T. Barnum file "was not suppressed regardless of its purportedly exculpatory character," reasoning that evidence is not suppressed under *Brady* where "'the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" *Id.* at 533 (quoting *State v. Skakel*, 276 Conn. 633, 701, *cert. denied*, 549 U.S. 1030 (2006)). They held that the State satisfied its constitutional duties of disclosure under *Brady* by providing to the defense the list of specific incidents/case numbers as to which the firearms analysis demonstrated a connection with two of the weapons used in the Pettway's shooting on February 2, 2002. *Id.* at 536. In so holding, the state courts rejected Petitioner's argument that the State also had an obligation under *Brady* to provide "the entire investigation file materials generated by the police with respect to the earlier shootings" (including the P.T. Barnum shooting), concluding that "the state must disclose the data which is potentially exculpatory but is not constitutionally obligated to connect the dots for the defense." *Id.* at 534–36. The courts reasoned that "the essential fact that the same weapon that was used in the February 2, 2002 Pettway store shooting had previously been used in several other

cases, including the P.T. Barnum Apartments home invasion, was disclosed along with information identifying the files pertinent to those earlier shootings." *Id.* Thereafter, the Connecticut Supreme Court denied Petitioner's request for discretionary review. *Lopez*, 340 Conn. 922.

Petitioner argues that the state courts' ruling was contrary to, and an unreasonable application of, clearly established federal law, as the P.T. Barnum file contained information he believes is exculpatory, impeaching, and material to the issue of his guilt, and thus should have been disclosed under *Brady* and its progeny. ECF No. 29 ¶¶ 83–92. For the reasons set forth below, the Court does not agree.

b. Relevant Federal Law

Through *Brady* and its progeny, the Supreme Court has clearly established the following principles. First, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To assert a *Brady* violation, a petitioner must allege three elements: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Although *Brady* addressed "the suppression by the prosecution of evidence favorable to an accused upon request," 373 U.S. at 87, the Supreme Court later clarified that the prosecution's *Brady* duties arise even in situations where the accused does not make a request for a particular piece of evidence, if the favorable nature of the evidence is obvious. *See United States v. Agurs,* 427 U.S. 97, 107 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it

gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made.”).

Additionally, the prosecution’s failure to disclose requested evidence may be a *Brady* violation if it misleads the defense. *See United States v. Bagley*, 473 U.S. 667, 682–83 (1985) (acknowledging that where a specific request for *Brady* evidence is made by the defense and the evidence is not disclosed, the prosecution’s failure to produce it may mislead the defense into believing the evidence does not exist). That said, the “Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.” *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). Rather, the nondisclosure must meet all three *Brady* elements to be a constitutional violation. *See Strickler*, 527 U.S. at 281–82.

c. Favorability

The state courts did not expressly analyze the favorability or materiality elements in denying Petitioner’s *Brady* claim on the merits. *Lopez II App.*, 208 Conn. App. at 533 (“The court determines that this evidence was not suppressed regardless of its purportedly exculpatory character.”). Regardless, deference is due to the state courts’ resolution of the entire *Brady* claim, not just the prongs it explicitly discussed in its holding. *See Richter*, 562 U.S. at 98 (“§ 2254(d) applies when a ‘claim,’ not a component of one, has been adjudicated”). A court need not rule on every element of a *Brady* claim: if one prong is not met, the entire claim fails. *Blalock v. Smith*, No. 08-CV-7528 (JPO), 2012 WL 3283439, at *10 (S.D.N.Y. Aug. 13, 2012) (“[A] petitioner must satisfy every prong of the *Brady* test in order to state a *Brady* claim.”).[10] For the purposes of

[10] Additionally, to the extent Petitioner claims the state courts’ failure to fully analyze the contents of the P.T. Barnum file is an unreasonable application of federal law, he cites no authority in support of any claim that a state court must specifically discuss each piece of evidence a petitioner submits is favorable. And discussed herein, AEDPA imposes no requirement that a state court provide *any reasoning at all*, much less a general requirement that it discuss particular pieces of evidence, in rendering its decision. *See Richter*, 562 U.S. at 98.

evaluating Petitioner's *Brady* claim, however, the Court assumes without deciding that the materials in the P.T. Barnum file were favorable to Petitioner. The Court discusses the materiality element below.

d. Suppression

The state courts' ruling that the P.T. Barnum file was not suppressed was not contrary to, or an unreasonable application of, clearly established federal law. As explained above, for the Court to find that the state courts' decision was contrary to federal law, that decision would need to "appl[y] a rule that contradicts the governing law set forth" by the U.S. Supreme Court, or would need to reach a different result than a Supreme Court case with "materially indistinguishable" facts. *Williams*, 529 U.S. at 405–06. And in order for a state court's decision to be an unreasonable application of clearly established federal law, it must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *LeBlanc*, 582 U.S. at 94. Neither standard is met here.

i. Due Diligence

To start, the state courts did not impose an unconstitutional "due diligence" requirement on Petitioner's trial counsel in finding that the materials from the P.T. Barnum file were not suppressed.

Although Petitioner frames the state courts' rulings as imposing a "due diligence" requirement on the defense, neither the habeas trial court nor the Appellate Court, in its adoption of the trial court's ruling, used the words "due diligence" with respect to Petitioner's *Brady* claims.

*See generally Lopez II App.*, 208 Conn. App. 515.[11] Thus, the state courts did not explicitly impose a due diligence requirement on Petitioner or his counsel.

In arguing that the state courts placed an unconstitutionally heavy burden of investigation, or "due diligence," on defense counsel, *see* ECF No. 29 ¶ 84; ECF No. 38 at 13–18, Petitioner primarily focuses on the state courts' citation to *State v. Skakel*, 276 Conn. 633 (2006). In *Skakel*, the Connecticut Supreme Court held that there was no *Brady* violation where defense counsel was aware of the existence of a potentially exculpatory composite sketch but never requested it from the prosecution. *See Skakel*, 276 Conn. at 701 ("*Brady* is designed to assure that the defendant is not denied access to exculpatory evidence known or available to the state but unknown or unavailable to him . . . It is not intended either to relieve the defense of its obligation diligently to seek evidence favorable to it or to permit the defense to close its eyes to information likely to lead to the discovery of such evidence."). The state courts in Petitioner's case analogized to *Skakel*, finding that "the circumstances of [Petitioner's] case are *more* compelling that no *Brady* violation occurred than those presented in the *Skakel* case." *Lopez II App.*, 208 Conn. App. at 536 (emphasis added). Specifically, "the potential for [the] information" that the same gun was used in the Pettway's and P. T. Barnum incidents "to help exonerate the petitioner speaks for itself," such that there was no need for the state to go beyond the disclosure and provide all materials generated by police with respect to the P.T. Barnum shooting. *Id.* at 534–35. Petitioner contends the state courts' ruling "is directly contrary to" several Supreme Court cases, including *Brady*, *Bagley*, *Kyles*, *Strickler*, and *Banks v. Dretke*, 540 U.S. 668 (2004). ECF No. 38 at 14. This view is unavailing, for several reasons.

[11] The state courts referenced "due diligence" with respect to Petitioner's claim of actual innocence based on "newly discovered evidence," which it analyzed under a different standard than his *Brady* claims. *Compare id.* at 530–536 *with id.* at 555–57.

As an initial matter, this Court does not sit in review of the Connecticut Supreme Court's decision in *Skakel*; rather, it sits in review of the state courts' decisions in Petitioner's case. As Respondent correctly noted at oral argument, *see* ECF No. 50 at 33, the question this Court must answer is not whether *Skakel* was correctly decided, but whether the state courts' finding *in Petitioner's case* was contrary to or an unreasonable application of clearly established federal law.

To the extent that the state courts' suppression analysis can be read as implicitly imposing a "due diligence" requirement, any such requirement does not violate clearly established federal law. Petitioner does not identify a U.S. Supreme Court case deciding the question of whether a defendant must exercise some form of "due diligence" to obtain information of which he is reasonably aware. It is true that the U.S. Supreme Court has never affirmatively placed a duty of inquiry or investigation on a defendant who wishes to avail himself of the *Brady* doctrine. *See Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) ("The Supreme Court has never required a defendant to exercise due diligence to obtain *Brady* material.") (citing *Agurs*, 427 U.S. at 107). But neither has the Supreme Court stated that such a duty does *not* exist, beyond holding that the prosecution's disclosure obligation may arise independent of any request from defense counsel, when the favorable nature of the evidence is "so clearly supportive of a claim of innocence" that it is obvious the evidence should be disclosed even without a defense request. *See Agurs*, 427 U.S. at 107.

Indeed, Petitioner himself concedes that the extent of any obligation a defendant may have to exercise due diligence is not settled law. He acknowledged as much in his petition for *certiorari* to the United States Supreme Court, emphasizing that both state and federal courts have "struggled with the parameters of the *Brady* rule and whether it embodies a due diligence requirement." Pet. for Cert., Resp. App'x QQ, ECF No. 34-25 at 25–26 (collecting cases). The Court's review of the

case law confirms that there is no settled U.S. Supreme Court precedent on this issue. Some circuit courts have disavowed a "due diligence" requirement. *See*, *e.g.*, *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) ("the availability of particular statements through the defendant himself does not negate the government's duty to disclose"), and *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 292 (3d Cir. 2016) ("the concept of 'due diligence' plays no role in the *Brady* analysis"). Others have clearly taken the opposite approach. *See, e.g.*, *Trottie v. Stephens*, 720 F.3d 231, 251 (5th Cir. 2013) ("a defendant cannot succeed on a *Brady* claim if he could have discovered the evidence through reasonable due diligence"); *United States v. Willis*, 277 F.3d 1026, 1034 (8th Cir. 2002) ("Publicly available information which the defendant could have discovered through reasonable diligence cannot be the basis for a *Brady* violation"); and *United States v. Parker*, 790 F.3d 550, 561–62 (4th Cir. 2015) ("when 'exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.'") (quoting *United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009)). The Second Circuit, for its part, has stated that "due diligence" requirements are constitutionally impermissible, while preserving the viability of the rule in this Circuit that "[e]vidence is not 'suppressed' [for *Brady* purposes] if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lewis*, 790 F.3d at 121 (distinguishing an impermissible "due diligence" requirement from the "essential facts" requirement because the latter "speaks to facts already within the defendant's purview, not those that might be unearthed. It imposes no duty upon a defendant, who

was reasonably unaware of exculpatory information, to take affirmative steps to seek out and uncover such information in the possession of the prosecution.”).[12]

The existence of this circuit split is at least indicative of a “lack of clarity in the Supreme Court’s jurisprudence.” *Hall v. Zenk*, 692 F.3d 793, 799 (7th Cir. 2012). While this is not dispositive of the question of whether law is “clearly established,” it certainly suggests as much. *See Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006) (“When the federal circuits disagree as to a point of law, the law cannot be considered ‘clearly established’ under 28 U.S.C. § 2254(d)(1)”); *Clark v. Portuondo*, No. 00-CV-2491 (DAB) (RLE), 2002 WL 31553502, at *5 (S.D.N.Y. Nov. 13, 2002) (where the Supreme Court had not yet resolved a circuit split regarding the degree of knowledge imputed to the prosecutor in determining suppression of evidence in *Brady* cases, the state court’s determination could not be “contrary to” or an “unreasonable application” of “clearly established” federal law); *Irick v. Capra*, No. 23-CV-09123 (JLR) (JLC), 2024 WL 3173278, at *6 (S.D.N.Y. June 26, 2024) (similar).

Given that Petitioner points to no U.S. Supreme Court case foreclosing a due diligence requirement, the Court cannot conclude that the state courts violated clearly established federal law, as set forth by the U.S. Supreme Court, to the extent they implicitly imposed one. To the extent the *Second Circuit* has foreclosed a due diligence requirement in its case law, “circuit precedent does not constitute clearly established Federal law.” *See Johnson*, 2026 WL 92190, at *3 (internal quotations omitted). The standard for showing entitlement to federal habeas relief is, and is meant to be, a difficult standard to meet. *Richter*, 562 U.S. at 102. Because the Supreme

[12] *But see United States v. Payne*, 63 F.3d 1200, 1208–09 (2d Cir. 1995) (“Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.”) (citing *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir.1975)).

Court has not clearly spoken on this issue, the Court cannot conclude that the state courts' decision here was contrary to federal law.

ii. Essential Facts

To the extent Petitioner claims that the state courts' application of the "essential facts" doctrine was an unreasonable application of clearly established federal law, this argument likewise fails.

As discussed above, the Second Circuit's essential facts test holds that "[e]vidence is not 'suppressed' [for *Brady* purposes] if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006). Petitioner does not contend that this test itself violates clearly established federal law, so the Court does not address that issue. And the state courts' application of the test was not unreasonable. Specifically, it was not unreasonable for the state courts to conclude that the "essential fact" was that the same weapon was used in the P.T. Barnum home invasion and the Pettway's shooting, and that disclosure of that fact satisfied the State's *Brady* obligations. As the state courts explained, the "potential for this information to help exonerate" Petitioner speaks for itself, *Lopez II App.*, 208 Conn. App. at 536, because use of the same weapon at the two incidents—one of which Petitioner was not alleged to have been involved in—was a potentially exculpatory piece of information that may have itself cast doubt on the allegation that Petitioner committed the Pettway's shooting.[13] Put another way, it was not

[13] Petitioner takes the opposite view, suggesting that the fact that one of the guns used at Pettway's was also used at P.T. Barnum and other incidents could be viewed by a defense lawyer as *inculpatory* with respect to Petitioner's involvement in the other incidents, rather than *exculpatory* with respect to the Pettway's shooting. *See* ECF No. 38 at 20. The Court disagrees; any competent defense attorney would see the value of the State's disclosure as opening a line of argument that someone other than Petitioner committed both the other incidents *and* the Pettway's shooting.

unreasonable to find that the State disclosed the exculpatory "essential fact." This was not an error "beyond any possibility for fairminded disagreement." *LeBlanc*, 582 U.S. at 94.

Petitioner suggests instead that the "essential fact" is not the connection between the firearms but rather "the information [within the P.T. Barnum police file] connecting Rosado, Rob Payton, and [Abdul-Hakeem] to the P.T. Barnum incident." ECF No. 38 at 20; *see id.* at 14 ("the 'essential fact' related to the Brady claim was not simply that the same gun was used in both incidents."). But even if the Court were to assume Petitioner's theory of the "essential facts" is correct and that *de novo* review were appropriate on this point, Petitioner's claim asserting *Brady* violations would still be unsuccessful for the reasons explained below: the information in the file was not material and thus its suppression could not have given rise to a Brady violation.

iii. Misleading Disclosures

Nor did the Appellate Court unreasonably apply (or act contrary to) U.S. Supreme Court law concerning misleading disclosures. Petitioner contends that the State misled him into believing that the disclosures about the P.T. Barnum home invasion were complete by (a) disclosing the police files for all but one of the five incidents related to the guns used during the Pettway's shooting, omitting only the file from the P.T. Barnum home invasion, and (b) with respect to the P.T. Barnum home invasion, disclosing only that Jerry Kollock was arrested and convicted in connection with "a burglary that took place in Bridgeport." ECF No. 38 at 9, 17–18. But the U.S. Supreme Court cases on which Petitioner relies are distinguishable.

For instance, this is not a case where the State had represented that it had an "open file" policy, such that Petitioner could have reasonably believed he had been given everything the State had in its possession. *Cf. Strickler*, 527 U.S. at 285 (noting that the prosecution's open file policy made it "especially unlikely that counsel would have suspected that additional impeaching

evidence was being withheld"). And it is not a case where the prosecution made an affirmative representation that it had, or would, disclose all *Brady* evidence. *Cf. Banks v. Dretke*, 540 U.S. 668, 693 (2004) (noting that the defendant could not be faulted for relying on an affirmative representation of the prosecution that it "would disclose all *Brady* material"). It also is not a case where Petitioner made a specific request for evidence that, when unanswered, could have led him to "assume from the nondisclosure that the evidence does not exist." *See Bagley*, 473 U.S. at 682–83. Of course, a prosecutor can commit a *Brady* violation even absent representations that he has an open file policy or that he will disclose all *Brady* material. But these cases suggest that such representations—which were not made here—can reasonably induce reliance by the defendant.

Here, by contrast, Petitioner could not reasonably have believed he had all of the relevant police files: the Robinson Report clearly disclosed five Bridgeport Police Department case numbers, ECF No. 12-15 at 252, and the evidence at the habeas proceeding demonstrated that Petitioner's counsel received only four files, plus minimal information about the fifth, *see* ECF No. 38-15 at 2. Simple arithmetic reveals that one full file was not disclosed, so Petitioner could not reasonably have been misled into believing that he had all five police files or that only four files existed.

Finally, the fact that the State's disclosure about the P.T. Barnum home invasion referenced only Kollock and not others who may have been involved in that event does not necessarily render it misleading under the Supreme Court's case law. As discussed above, the Supreme Court's cases have relied on affirmative representations by the prosecution about its open files or its intent to produce all *Brady* material to find a partial disclosure or non-disclosure misleading. But Petitioner seeks an extension of these cases to cover the "implied representations" he claims the State made when it disclosed Kollock's conviction but not the involvement of Abdul-Hakeem or Rosado. ECF

No. 38 at 18. He identifies no Supreme Court case that goes this far, such that the Connecticut state courts' holding that there was no *Brady* violation could be considered an unreasonable application of clearly established federal law.[14]

2. *Mahoney Notes (Category Two)*

The Court next addresses the Mahoney Notes and concludes that their non-disclosure likewise does not entitle Petitioner to federal habeas relief. The Mahoney Notes appear as follows in a version of the Robinson Report that was not disclosed to Petitioner's trial counsel:


Items #5 through #13 were fired in the same Glock pistol that fired cartridge case evidence in the following Bridgeport cases:
01D1739
01D1796


*See* ECF No. 34 at 19.

a. Adjudicated on the Merits

First, the Court finds that the claim related to the Mahoney Notes was "adjudicated on the merits" by the state courts, such that it warrants the application of AEDPA deference. Although it is undisputed that the state courts' rulings did not address the Mahoney Notes, it is inappropriate for the Court to view the issue of the Mahoney Notes as a distinct, second *Brady* claim that was

[14] Petitioner also suggests that the Appellate Court unreasonably determined the facts "to conclude that the factual disclosure related to Jer[ry] Kollock's conviction was sufficient to alert the defense to the exculpatory information contained in the P.T. Barnum police file." ECF No. 38 at 18. But what Petitioner challenges is not a factual finding by the state courts; it is instead a legal conclusion addressed by the Court's analysis above.

not adjudicated on the merits by the state courts and thus does not warrant AEDPA deference. ECF No. 54 at 6–7.

First, viewing the Mahoney Notes as a second, separate *Brady* claim is a departure from Petitioner's litigation practice over the course of his various collateral attacks on his conviction, in which he has consistently presented his arguments about withheld evidence as part of one "claim," "count," or "ground" for relief. *See* ECF No. 29 ¶¶ 77–81 (listing all three categories of allegedly suppressed evidence under "Count One" and stating "[t]he evidence contained in paragraph (78) through (80) is exculpatory or otherwise material favorable evidence that should have been disclosed to the petitioner or his counsel prior to his criminal trial."); Am. Sec. State Habeas Pet., ECF No. 29-1 ¶¶ 47–53 (listing several categories of allegedly suppressed evidence under "Count Two" and, similarly, describing them collectively as "exculpatory or otherwise material favorable evidence that should have been disclosed to the petitioner or his counsel prior to his criminal trial"); ECF No. 12-15 at 5 ("Statement of the Issues: I. Whether the petitioner's due process rights were violated by the prosecuting authority's suppression of material[] favorable evidence.").

To be sure, in Petitioner's reply brief before the Appellate Court, he explained his view that the second state habeas court's reasoning in denying the *Brady* claim was not clearly applicable to the Mahoney Notes. Sec. State Habeas App. Reply Br., Resp. App'x O, ECF No. 12-17 at 6–7; ECF No. 54 at 6–7. But contrary to Petitioner's assertion, this legal argument regarding the weakness of the second state habeas court's reasoning is just that—legal argument in support of Petitioner's position, rather than proof "that the handwritten notes were part of a separate *Brady* claim." *Cf.* ECF No. 54 at 7. Indeed, courts are frequently presented with habeas petitions in which a petitioner claims multiple pieces of evidence were suppressed under different circumstances and require different inferences as to suppression or favorability—and treat those

pieces of evidence as part of a single *Brady* claim for the purposes of analyzing the materiality prong and the overall success or failure of the claim. *See, e.g.*, *Kyles*, 514 U.S. at 436–37 (setting forth the rule that the materiality analysis must consider "cumulative effect" of separate pieces of evidence). Petitioner offers no authority supporting that different pieces of evidence should be analyzed separately with respect to favorability or suppression—or with respect to whether a *Brady* claim was adjudicated "on the merits" for the purposes of applying AEDPA deference. Thus, the Court cannot artificially separate one *Brady* claim into two. As a result, both the P.T. Barnum file and the Mahoney Notes are appropriately treated as one claim for the purposes of the Court's determination of whether the Appellate Court's decision is afforded AEDPA deference.[15]

The Court recognizes, however, that an exception may apply here. In general, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption applies even "when a state-court opinion addresses some but not all of a defendant's claims." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). One of the reasons for this rule is that there may be "instances in which a state court may simply regard a claim as too insubstantial to merit discussion," and the "federal courts have no authority to impose mandatory opinion-writing standards on state court." *Id.* at 299–300.

But the presumption that the state court adjudicated the claim on the merits may be overcome, in limited circumstances, "when there is reason to think some other explanation for the state court's decision is more likely," such as that the claim was denied on a procedural ground.

[15] The Court recognizes that this approach differs from that taken by the Second Circuit in *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001). But Respondent convincingly argues that *Boyette* may be implicitly overruled by U.S. Supreme Court cases decided after it. *See* ECF No. 53 at 7.

*Id.* at 99–100. For example, where "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," the claim "has not been evaluated based on the intrinsic right and wrong of the matter" and the state court's rejection does not merit AEDPA deference. *Johnson*, 568 U.S. at 302–03. Petitioner argues that the habeas court's reasoning (as adopted by the Appellate Court) does not logically account for the Mahoney Notes because it concluded the State met its disclosure obligations with respect to the P.T. Barnum file, *Lopez II App.*, 208 Conn. App. at 533–36, even though it was undisputed that the Mahoney Notes were never disclosed.

This is a close question. But even assuming, without deciding, that the Mahoney Notes *Brady* claim was not adjudicated on the merits—the Court concludes that, on *de novo* review, the State's failure to disclose the Mahoney Notes was not a *Brady* violation meriting federal habeas relief.

b. The First Two *Brady* Elements

First, to take up the easiest question: Respondent has conceded the Mahoney Notes were not disclosed. Thus, the Court turns to whether they can be considered favorable, for purposes of *Brady*. It cannot find that they were.

The Mahoney Notes appear on a copy of the Robinson Report that was part of the Pettway's file, but so much of their provenance is unknown that the Court cannot find that they are exculpatory.[16] There is no evidence in the record about who wrote the notes or what they mean. Petitioner assumes that the handwritten words "now a suspect" means that Mahoney was "now a suspect" in the Pettway's shooting, simply because the Mahoney Notes appear in the Pettway's file. While this may be one plausible explanation for the note, the Robinson Report also discussed

[16] Petitioner does not argue that the Mahoney Notes would have been impeachment material; he focuses on their relevance to a third-party culpability theory—*i.e.*, that they were exculpatory.

five other shooting investigations; although Mahoney was the victim in one of them, it is also plausible that he was deemed a suspect in one of the other four, including the P.T. Barnum home invasion that he later admitted to planning. And, as Petitioner acknowledges, Mahoney, Rosado, Polo, Kollock, and Payton were "friends and associates in criminal activity," ECF No. 29 ¶ 26, and Mahoney testified before the second state habeas court that he "used to . . . do a couple of robberies with [Polo]," Sec. State Habeas Trial Tr., Pet. Ex. 5, ECF No. 29-5 at 11, such that it is possible Mahoney was a suspect in any number of open criminal cases.

Petitioner points to no other records from the Pettway's shooting file that suggest Mahoney was being treated as a suspect in *that* investigation, as opposed to one of the others. Accordingly, the offhand reference to Mahoney as "now a suspect"—devoid of any context as to what investigation he was a suspect in—is insufficient to rise to the level of exculpatory evidence, for purposes of *Brady*.[17] And without inferring that Mahoney was "now a suspect" in the Pettway's shooting, the mere mention of his name in the file is stripped of any meaning or potential exculpatory value.

Thus, the Court cannot find the Mahoney Notes were favorable to Petitioner, so as to form the basis of a *Brady* violation.

*3. Materiality*

Finally, the state courts did not expressly analyze the materiality of the allegedly suppressed evidence. As discussed above, deference is nonetheless due to the state courts' resolution of the entire claim. *Richter*, 562 U.S. at 98. But Petitioner argues that any finding that

[17] Petitioner notes that Mahoney was cross-examined at the second habeas trial concerning how some of his features, including his skin tone, were similar to Petitioner's. *See* ECF No. 38 at 25–26. He suggests this supports the idea that Mahoney may have, in fact, been a perpetrator of the Pettway's shooting, consistent with the "now a suspect" reference. It is ironic, to say the least, that Petitioner now seemingly points the finger at the witness Petitioner relied on in prior proceedings to *exculpate* him in the Pettway's shooting. But in any event, there is no evidence in the record to suggest that the State perceived any similarities in appearance between Mahoney and Petitioner to be exculpatory at the time of trial.

the undisclosed evidence from the P.T. Barnum file and the Mahoney Notes is immaterial is an unreasonable application of established federal law. Accordingly, the Court addresses that issue, and finds that this evidence was immaterial for *Brady* purposes.

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682); *see also id*. at 436–37 (noting that the "Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles*, 514 U.S. at 434); *see also Bagley*, 473 U.S. at 675 ("[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial"). Where multiple pieces of material evidence remain undisclosed, the impact of their suppression should be considered cumulatively, rather than individually. *See Kyles*, 514 U.S. at 436 ("The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item.").

The Court disagrees with Petitioner's contention that the P.T. Barnum file—including the fact that Abdul-Hakeem, Rob Payton, and potentially Rosado were involved in that incident—and the Mahoney Notes, taken collectively, were material under *Brady*. The Court examines the evidence individually first, and then cumulatively.

a. Impeachment Evidence for Rosado

First, the P.T. Barnum file was not material impeachment evidence with respect to Rosado's testimony at Petitioner's trial. In general, impeachment evidence may be material where the witness in question supplied the "only evidence linking the defendant to the crime" or the "only evidence of an essential element of the offense." *United States v. Avellino*, 136 F.3d 249, 256–57 (2d Cir. 1998). A finding of materiality is also likely when the undisclosed evidence "would have provided the only significant basis for impeachment." *Id.* at 257. However, undisclosed impeachment evidence, like other *Brady* material, "is not material . . . when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Thus, for example, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Id.*

Here, Rosado was not the only trial witness who implicated Petitioner in the shooting. A second witness, Tony Payton, also placed him there. *See Lopez* , 280 Conn. at 783 ("an eyewitness, Tony Payton, knew both men and was able to identify them as Boo McClain and the defendant"); Crim. Trial Tr., Resp. App'x V, ECF No. 34-4 at 18 (Payton confirming he saw Petitioner (nicknamed Buttafuco) firing a shotgun at Abdul-Hakeem (nicknamed Polo)); Crim. Trial Tr., Resp. App'x X, ECF No. 34-6 at 36 (prosecutor's closing argument noting that "Tony Payton has identified the defendant").

And Rosado's credibility was impeached by Petitioner's trial counsel on several different grounds, such that the P.T. Barnum home invasion file evidence would have been merely cumulative. The cross-examination included that Rosado had previously used an alias to commit crimes and evade responsibility for crimes, *see* Crim. Trial Tr., Resp. App'x W, ECF No. 34-5 at

126–27; that Rosado was facing a potential sentence of between fifteen and seventeen-and-a-half years' incarceration on a then-pending federal charge and may have had a motivation to help the prosecution convict Petitioner in exchange for consideration at his federal sentencing, *id.* at 127–28; that Rosado had eight separate prior convictions for selling narcotics and additional convictions for other crimes, for which he was sentenced to incarceration, *id.* at 130–36; that certain other state charges were nolled by the State, *id.* at 134; that Rosado may have been carrying a firearm the night of the Pettway's shooting, *id.* at 137–38; that he only saw one shooter who had a mask over part of his face, despite that there were multiple shooters at the event, *id.* at 141, 151–52, 163; that Rosado claimed he did not provide information to police about the shooting while he was in the hospital, and that he later gave a statement only after being encouraged to do so by his parole officer, but that the police report reflected that he did give a statement while at the hospital describing the clothing of the shooter, *id.* at 146–48, 175–78; and that Rosado based his identification of Petitioner solely on Petitioner's somewhat generic clothing and his hair, *id.* at 162–63, 164–66. Additionally, one of Rosado's prior convictions was for assault in the second degree, *id.* at 136, so he was cross-examined in relation to committing physical violence.[18] And after cross-examining Rosado on each of these grounds, Petitioner's counsel's closing argument targeted Rosado's credibility as a central issue for the jury to decide: "it seems to me that that's the crucial issue in the case that you're going to have to make a decision as to the reliability of Manu[e]l Rosado's identification given the totality of the evidence." ECF No. 34-6 at 39–40; *see also id.* at 44–46, 51–54. Trial counsel's closing argument also discounted the possibility that

[18] Before closing arguments, Petitioner's trial counsel moved for a judgment of acquittal, specifically "point[ing] [Judge Lubbie Harper's] attention to the testimony of Manu[e]l Rosado and the circumstances under which he gave the information he gave." ECF No. 34-6 at 5. The motion was denied, as the Court found the State had presented sufficient information to allow the jury to decide the question of Petitioner's guilt. *Id.* at 6.

Petitioner was shooting at Rob Payton at Pettway's because "nobody was shooting at Mr. Payton." *Id.* at 43.

Given the many ways in which Petitioner's trial counsel impeached Rosado and attempted to cast doubt on his identification of Petitioner, the Court cannot conclude that evidence of Rosado's alleged involvement in the P.T. Barnum home invasion would have been material to the verdict in Petitioner's trial. Indeed, it is questionable whether such evidence would even have been admissible under Federal Rule of Evidence 404(b) and 403 and Connecticut Code of Evidence §§ 4-4 and 4-3. Moreover, given that nothing in the P.T. Barnum file implicated Rosado in the crime beyond being present in a car in the parking lot while it occurred,[19] any impeachment on the basis that he was treated favorably by not being arrested for that crime would have been merely cumulative.

b. Third-Party Culpability Theory

Additionally, any theory that the evidence would have allowed Petitioner to mount a defense of third-party culpability based on Abdul-Hakeem's and Rosado's alleged involvement in the P.T. Barnum home invasion is speculative at best. To start, the still-tenuous link between the P.T. Barnum home invasion and the Pettway's shooting did not become apparent until Mahoney's habeas testimony in 2017 implicating Brad Rainey in the Pettway's shooting. *See* ECF No. 50 at 4 (Petitioner's counsel, in response to a question from the Court about the link between the gun used to perpetrate the P.T. Barnum home invasion and the Pettway's shooting: "So I know there's a few pieces to that. So I think that the most fleshed-out version comes from Marcus Mahoney at the habeas where he says essentially he's in a group of individuals who are discussing this robbery. I think what I take from that was there was sort of maybe an inside man situation where somebody

[19] Both Rosado's statement and Rainey's statement from the P.T. Barnum file are consistent in this regard. *See* ECF No. 38-2; ECF No. 38-5.

set up this robbery . . . And it didn't go the way it was supposed to go. There was a rift in this group. And Mahoney ultimately says that he's there and sees this individual, Brad Rainey, and others who were involved in the P.T. Barnum robbery do the shooting at Pettway's."). At the time of Petitioner's trial, Mahoney's information about the P.T. Barnum home invasion, or about Brad Rainey's alleged involvement in both events, was not known by the State; it did not come out until some fourteen years later. *See* ECF No. 53 at 12 n.7 (citing Sec. State Habeas Trial Tr., Resp. App'x NN, ECF No. 34-33 at 134–35). And without Mahoney's information, the connection between the two incidents (aside from the similarity in firearms, which was disclosed) was far from clear.

Indeed, even after a careful, *post hoc* review of the voluminous record in this case, the Court has trouble piecing together how the State could have viewed the P.T. Barnum police file as exculpatory for Petitioner on the basis of a third-party culpability theory, or how it would have been material to his guilt at trial. Petitioner's speculative articulation of the potential third-party culpability theory—that the Pettway's shooting may have been retaliation for the manner in which the P.T. Barnum home invasion was carried out—involves a veritable daisy chain of logic occupying no fewer than 20 bullet points to explain in Petitioner's brief. ECF No. 38 at 27–28. This convoluted set of inferences (which include Mahoney's later-revealed statements not known to the State at the relevant time) cannot be said to create a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433. Petitioner's theory involves concluding that Abdul-Hakeem, Rosado, and Rainey were indeed involved in commission of the P.T. Barnum home invasion; that Rainey knew of the excesses taken with the victims in that incident and that he believed Abdul-Hakeem and Rosado were responsible for them; and that he begrudged Abdul-Hakeem and Rosado sufficiently

enough for those excesses that he, and several other shooters, fired at them (and others) in a crowd at Pettway's a few days later—a proposition for which Petitioner points to no evidence in the record. And the State would have had to put all of that together on the basis of the P.T. Barnum file alone, without the benefit of Mahoney's inside information connecting the two events.

Based on a thorough review of the record, the Court concludes that the P.T. Barnum file was not so apparently exculpatory that it was required to be disclosed, and that the failure to disclose it did not deprive Petitioner of a fair trial.[20] Petitioner's claim that disclosure of these materials would have allowed him to attack the sufficiency of the Pettway's police investigation is likewise speculative. At the very least, fairminded people may disagree about whether prosecutors should have turned over evidence within the P.T. Barnum file, so the state courts' ruling could not have been an unreasonable application of federal law. Without testimony demonstrating additional links between the two incidents—or, indeed, any testimony at all on how the P.T. Barnum incident may have provided motive for the Pettway's shooting, as Petitioner suggests—it is reasonable to conclude that the State also may not have understood there to be a deeper connection between the two incidents than one gun. And while the state courts did not mention each piece of the P.T. Barnum file evidence individually, they opined that the "third-party culpability evidence and the inferences sought to be drawn from it" was "tangled, tenuous, and conjectural." *Lopez II App,*, 208 Conn. App. at 553. That conclusion was not unreasonable.

[20] Petitioner's argument that the P.T. Barnum file would have helped him counter the motive evidence put forward by the State—that Petitioner intended to harm Rob Payton, who was present at Pettway's and against whom Petitioner had apparently made a threat in the past, *see* ECF No. 38 at 21–22—is likewise speculative, at best. Indeed, both the State and Petitioner's counsel referred in the closing arguments to the judge's jury charge that the State was not required to prove motive in order for the jury to convict Petitioner. *See* ECF No. 34-6 at 34, 42. In light of the entire trial record, the Court cannot find that, had the P.T. Barnum file evidence been disclosed, there was a "reasonable probability" that "the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433.

c. Mahoney Notes

Finally, for many of the same reasons that the Court concluded the Mahoney Notes were not exculpatory, neither are they material. There is simply insufficient information about who made the Notes and what they mean to suggest that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433. Petitioner claims that, had the Mahoney Notes been disclosed, he could have identified Mahoney earlier, and thus *either* potentially obtained the exculpatory testimony Mahoney gave at the second state habeas trial earlier *or* been able to point to Mahoney as a potential perpetrator of the Pettway's shooting during his criminal trial. *See* ECF No. 38 at 25–26; ECF No. 29 ¶¶ 63–65. The first of these arguments is highly speculative. The state courts noted that Mahoney left Connecticut after the Pettway's shooting for a few months and did not ever disclose his knowledge to authorities "[d]espite believing the petitioner was innocent." *Lopez II App.*, 208 Conn. App. at 564. Instead, it took him years to disclose his information to Petitioner's investigator. Thus, the likelihood that Mahoney would have come forward before or during Petitioner's trial is very low. Similarly, Petitioner's theory that he might have been able to point the finger at Mahoney as a possible perpetrator of the Pettway's shooting based on Mahoney's having similar physical characteristics to Petitioner is underdeveloped, to say the least. Indeed, the thrust of Petitioner's habeas petition is that Rainey and others committed the Pettway's shooting—not that Mahoney did.

d. Cumulative Analysis

In sum, even if all of the evidence discussed above from the P.T. Barnum file and the Mahoney Notes is considered collectively, *see Kyles*, 514 U.S. at 436–37, the Court cannot conclude that Petitioner did not receive a fair trial without it, for all the reasons discussed. There is simply no reasonable probability that, "had the evidence been disclosed to the defense, the result

of the proceeding would have been different." *Kyles*, 514 U.S. at 433. Rosado was effectively impeached without disclosure of the P.T. Barnum file; Petitioner's third-party culpability theory was highly convoluted; and the Mahoney Notes are untenably ambiguous. Even taken in combination, the Court cannot conclude that disclosure of the contents of the P.T. Barnum file and the Mahoney Notes would have created a reasonable probability of a different result in Petitioner's trial. Accordingly, the Court concludes that there has been no *Brady* violation.

e. "Materially Indistinguishable" Cases

Finally, the Court cannot conclude that the states courts decided this case differently than the U.S. Supreme Court has decided cases with what Petitioner contends are "materially indistinguishable" facts. *Williams*, 529 U.S. at 406; ECF No. 38 at 32–33.

Petitioner provides only a broad overview of the facts from *Kyles* and *Wearry v. Cain*, 577 U.S. 385 (2006)—the two cases that he deems to be materially indistinguishable from his own. ECF No. 38 at 32–33. But neither case is, in fact, materially indistinguishable from Petitioner's case. In *Kyles*, the suppressed evidence included statements from eyewitnesses that described the assailant as having features vastly different from the defendant and whose testimony changed dramatically over time, repeated inconsistencies in other witness statements, self-incriminating statements by one witness, and evidence from the parking lot where defendant allegedly parked, showing that his car was not there at the relevant time. *See* 514 U.S. at 441–52. In *Wearry*, the suppressed evidence included statements made by a key witness of his desire to ensure the defendant "gets the needle cause he jacked [the witness] over," information showing that the same witness believed that lying about having witnessed the murder would help him get out of jail, information that another witness had sought to obtain a reduction in his sentence in exchange for testifying and had been told by the police that they would talk to the district attorney on his behalf

if he "told the truth," and a failure to turn over medical records that contradicted the witness's account of relevant events. *See* 577 U.S. at 389–90.

These facts from *Kyles* and *Wearry* cannot be considered "materially indistinguishable" from those at issue here. Both cases primarily involved the withholding of information that cast significant doubt on the testimony given by a key witness, based on inconsistencies in the witness's own statements over time. By contrast, the allegedly suppressed evidence here relates to a speculative, convoluted third-party culpability theory of defense, and to possible impeachment evidence that is not material, for the reasons discussed above. In both *Kyles* and *Wearry*, the specificity of the suppressed evidence and its power to undermine the state's theory of the case were vastly stronger than the allegedly suppressed evidence here, making the facts of those cases inherently distinguishable from the facts presented here. Thus, the Court cannot find that the state courts reached the opposite conclusion than the U.S. Supreme Court when confronted with cases with materially indistinguishable facts.

In sum, the petition is denied with respect to Count One.

## IV. SECOND CLAIM: INEFFECTIVE ASSISTANCE OF COUNSEL

The Court next rejects Petitioner's contention that he is entitled to habeas relief because he was denied his constitutional right to effective assistance of counsel. Petitioner asserts trial counsel failed to conduct an adequate investigation, failed to adequately prepare and present a defense, failed to present an alibi defense, and failed to investigate and pursue a third-party culpability theory. ECF No. 29 ¶¶ 95–99. For the reasons below, Petitioner's request for habeas relief with respect to this claim is denied.

A. Legal Standard

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const., am. VI; *see Gideon v. Wainwright*, 372 U.S. 335 (1963) (holding that the Fourteenth Amendment incorporates the Sixth Amendment right to counsel in state criminal proceedings). "It has long been recognized that the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970) (emphasis added). Pursuant to the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), a claim of ineffective assistance of counsel is reviewed under a two-part standard. First, a petitioner must show that counsel's conduct constitutes deficient performance, meaning it "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Id.* at 687–88. When assessing deficient performance, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Id.* at 689–90 (internal quotations and citation omitted).

Second, a defendant must show that his counsel's deficient performance resulted in prejudice. *Id.* at 692. A finding of prejudice requires the Court to conclude that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. That reasonable probability must "undermine confidence in the outcome" of the trial. *Id.* Both prongs must be satisfied to succeed. *Id.* at 700.

The Court evaluates counsel's conduct at the time the decisions were made, not in hindsight, and affords "'a heavy measure of deference'" to counsel's decisions. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 691). In the context of a § 2254 habeas

corpus petition based on ineffective assistance of counsel, the Court "must be 'doubly deferential' in order to afford both the state court and the defense attorney the benefit of the doubt." *Woods*, 575 U.S. at 316–17 (internal quotation marks and citation omitted). Petitioner bears the burden of demonstrating a violation of his Sixth Amendment right. *See United States v. Cronic*, 466 U.S. 648, 658 (1984).

B. Discussion

The Court concludes that the petition must be denied as to Claim Two.

Petitioner asserts four grounds for ineffective assistance of trial counsel in his amended petition: failure to conduct an adequate investigation into viable theories of third-party culpability and Petitioner's whereabouts at the time of the shooting; failure to adequately prepare and present a defense; failure to present an alibi defense; and failure to investigate and pursue a third-party culpability argument relating to the P.T. Barnum incident. ECF No. 29 ¶ 96. In the habeas traverse, Petitioner streamlines those claims as follows: failure to investigate and present an alibi defense and failure to investigate and present a third-party culpability defense. *See* ECF No. 38 at 33–38.[21] As it appears the two framings are substantively indistinguishable, the Court evaluates the latter.

Petitioner asserts that trial counsel's failure to adequately investigate and present an alibi defense or a theory of third-party culpability constitutes ineffective assistance of counsel, and that the state habeas courts' determinations to the contrary are based on an unreasonable application of federal law and an unreasonable determination of facts. ECF No. 29 ¶¶ 98–99; ECF No. 38 at 33–38. Petitioner raised these ineffective assistance of counsel claims in his first state habeas petition.

[21] The Court notes that Petitioner provides a brief overview describing trial counsel's investigation process, but does not appear to assert an argument in this section beyond a claim that trial counsel misunderstood the burden of proof applicable to alibi and third-party culpability defenses. *See* ECF No. 38 at 34.

First State Habeas App. Rec., Resp. App'x F, ECF No. 12-8 at 8. The first state habeas court ruling, upheld in full in 2014 by the Connecticut Appellate Court, held that counsel was not ineffective for failing to further investigate or pursue the alibi defense. *Lopez I*, 2012 WL 234150 at *8; *Lopez I App*, 150 Conn. App. 905 (2014) (per curiam). This holding focused on the allegation regarding an alibi defense, and did not address any claim regarding trial counsel's alleged failure to present a third-party culpability defense, based upon the first habeas court's conclusion that habeas counsel focused his efforts, evidence, and argument on the alibi defense. *Lopez I*, 2012 WL 234150 at *1. Trial counsel's failure to pursue a third-party culpability defense was, however, analyzed and rejected as part of Petitioner's second state habeas petition, in which he asserted ineffective assistance of habeas counsel. *See Lopez II App.*, 208 Conn. App. at 552–54; *see also* Order, ECF No. 16, at 9–10.

For the reasons set forth below, the state courts' determination that trial counsel's failure to assert an alibi defense or third-party culpability theory did not constitute ineffective assistance of counsel was not an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. *See LeBlanc*, 582 U.S. at 94; *Cardoza*, 731 F.3d at 178.

*1. Alibi Defense*

First, Petitioner's trial counsel was not deficient in failing to pursue Petitioner's alibi defense.

In 2012, the first state habeas court denied Petitioner's habeas claim asserting ineffective assistance of trial counsel for failure to present an alibi defense. *Lopez I*, 2012 WL 234150 at *8. The court acknowledged that "the evidence at the habeas trial establishes that the petitioner may have had a viable alibi defense." *Id.* at *5. The offered alibi was that Petitioner was not in Bridgeport on the night of the shooting, but that he and his sister Rosa instead stayed with a family

friend, Star Semedo, who lived in Ansonia, Connecticut, from "the early evening hours" of February 1, 2002, until the "mid morning hours of February 2, 2002." *Id.* at *6. But the court noted that the viability of any such defense "depends in large part upon the credibility of the three witnesses who could be called upon to establish that alibi." *Id.* at *5. It then concluded that each of the three witnesses Petitioner asserted could support his alibi defense—himself, his sister Rosa Lopez, and Ms. Semedo—had "an easily discernible vested interested in the outcome of the case," thus limiting their credibility as alibi witnesses. *Id.* at *6. In addition to the concerns about witness credibility, the court found the alibi unpersuasive for the following reasons: (1) no one ever approached the police or the prosecutors to tell them Petitioner could not have been the shooter; (2) there were inconsistencies between the alibi story and other asserted facts; (3) Petitioner offered a changing set of alibi witnesses, (4) both Rosa Lopez and Ms. Semedo presented nearly identical alibi statements "[d]espite testifying that they had not collaborated on their alibi stories"; and (4) Petitioner had apparently used his mother as part of a failed alibi defense in a prior trial. *Id.* at *6–8.

In considering counsel's failure to investigate this alibi defense under *Strickland*, the state habeas court concluded that failure to investigate a credible alibi would be deficient performance only where the alibi is "worthy of belief." *Id.* at *6. Because Petitioner's alibi was not "worthy of belief," the court reasoned that counsel's decision not to investigate and present it did not constitute deficient performance. *Id.* Even if it *had* constituted deficient performance, though, the court further concluded that prejudice did not result, as "had [trial counsel] gone forward with this alibi defense as the petitioner says he wanted, the likelihood of conviction would have gone up, not down. A rejected alibi is generally fatal to a criminal defendant's chances for acquittal." *Id.*

at *8. Thus, under *Strickland*, Petitioner's claim for ineffective assistance of counsel failed. *See id.*

The state habeas court's evaluation of trial counsel's decision not to investigate or pursue the proposed alibi defense as a strategic decision comports with the principle that trial strategy decisions must be given great deference, and that decisions to advance only certain arguments should be viewed with a "strong presumption" that trial counsel's reason for doing so was tactical rather than neglectful. *Strickland*, 466 U.S. at 689; *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (addressing issue in the context of closing arguments). The first state habeas court considered the value and shortcomings of the proposed alibi defense, including concerns about witness credibility, conflicting facts, and the significant negative consequences an unsuccessful alibi defense could pose to Petitioner's case, before concluding that the alibi was "not worthy of belief" and that any determination by trial counsel not to rely on it reflected a strategic decision rather than a constitutionally deficient one.

Petitioner's argument that trial counsel's decision not to pursue the alibi defense was due to his "general disfavor" for such defenses, rather than a strategic decision, *see* ECF No. 38 at 35–36, is unpersuasive. The first state habeas court's analysis explains why not pursuing the alibi defense was likely a strategic choice, citing concerns about witness credibility, conflicting facts, and the significant negative consequences an unsuccessful alibi defense could pose to Petitioner's case. And Petitioner fails to explain why a determination that a strategic decision (like this one) does not constitute deficient performance is an unreasonable application of clearly established federal law. This Court finds that such a determination is, in fact, aligned with federal law, which holds that strategic decisions by trial counsel should be given deference.

Petitioner further challenges this finding as resting on unreasonable determinations of the facts, asserting the state habeas court got the timeline wrong. But none of his arguments render the habeas court's determination unreasonable. Petitioner first points out that he was not arrested for his involvement in the Pettway's shooting until several months after the fact; he was arrested shortly after Pettway's for a different crime. ECF No. 38 at 36. Petitioner suggests his family members thus would not have been able to tell the police about his alibi relating to Pettway's when he was arrested shortly after the shooting. *Id.* But Petitioner does not explain how this could undermine the habeas court's point that, at the end of the day, "nobody ever approached the police or the prosecutors to inform them that they had the wrong man on trial." *See Lopez I*, 2012 WL 234150 at *7. Second, Petitioner argues that the habeas court incorrectly relied on a set of notes to conclude that sentencing counsel had investigated and ruled out the validity of his alibi, when the notes were dated months after the sentencing. ECF No. 38 at 36. The habeas court did not make any such conclusion about sentencing counsel's investigation; thus, Petitioner's argument to this effect is of no import. Accordingly, the Court defers to the first state habeas court's conclusion relating to the alibi defense, and finds that it was not unreasonable.

2. *Third-Party Culpability Defense*

Nor was Petitioner's trial counsel deficient in failing to pursue the third-party culpability defense.

Although Petitioner asserts that the state court "failed to meaningfully assess the significance of the panacea of the available evidence to support the third-party culpability theory," ECF No. 38 at 37, the record before this Court indicates that the first state habeas court's decision not to consider that claim was based on the actions of habeas counsel before and during the associated habeas hearing. *See Lopez I*, 2012 WL 234150 at *1 (noting that counsel seemed to have abandoned other claims included in the petition in favor of the ineffective assistance of

counsel claim associated with the failure to investigate and present the alibi defense). And the second state habeas court did assess whether trial counsel was ineffective in choosing not to present a third-party culpability defense. *See Lopez II App.*, 208 Conn. App. at 552–54 (analyzing Petitioner's claim that *habeas* counsel was ineffective for failing to challenge *trial* counsel's decision not to present the third-party culpability theory).

In 2021, the second state habeas court considered trial counsel's failure to investigate and present a third-party culpability defense as part of its analysis of Petitioner's claim of ineffective assistance of habeas counsel. *See id.* It considered Petitioner's argument that trial counsel "ought to have attempted to demonstrate that the Pettway store shootings were prompted by the excesses engaged in during the P.T. Barnum Apartment home invasion of the week before," but found this argument unpersuasive based on the record before it. *Id.* at 552–53. It characterized the "third-party culpability evidence and the inferences sought to be drawn from it" as "tangled, tenuous, and conjectural." *Id.* at 553. Thus, it determined that habeas counsel was not ineffective for failing to argue that trial counsel was ineffective for not presenting a third-party culpability defense. *Id.* at 554.

Based on the record before it, this Court cannot find that the second state habeas court's conclusion constituted an unreasonable application of federal law. As the second state habeas court noted, and as described above, Petitioner's evidence to support a third-party culpability defense is "laden with suppositions and surmise" and would have required a jury to make multiple levels of inferences not fully supported by the facts available at the time of Petitioner's criminal trial. *See id.* 553. Reasonable counsel, thus, could have decided not to pursue that defense in favor of other strategy. The Court does not find that Petitioner has established any reason to depart from

such deference or otherwise find that the second state habeas court erred when it concluded that a failure to pursue this defense did not render counsel ineffective.

Accordingly, the Court denies the petition insofar as it alleges that Petitioner is entitled to habeas relief because trial counsel failed to investigate and present the alibi defense or the third-party culpability defense, in violation of Petitioner's Sixth Amendment right to effective assistance of counsel.

## V. THIRD CLAIM: PRESENTATION OF FALSE TESTIMONY

The Court also rejects Petitioner's contention in Claim Three that he was denied due process because the state prosecutor presented false testimony through Rosado. Specifically, Petitioner alleges that Rosado testified falsely that he had no "hope or expectation for favorable treatment" in his then-pending federal criminal case based on his testimony at Petitioner's criminal trial. ECF No. 29 ¶ 101.

### A. Legal Standard

A conviction must be set aside where false testimony was presented at trial, the prosecution knew the testimony was false and failed to correct it, and there is a reasonable likelihood that the false testimony could have impacted the jury's determination. *See Giglio*, 405 U.S. at 153–54 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003). In *Giglio*, the Supreme Court held that an agreement between the prosecutor and a testifying witness about benefits the witness may receive in exchange for testimony was impeachment evidence that the prosecution ought to have disclosed, and that the witness offered false testimony when he disclaimed the promise of any such benefits while on the stand. *Giglio*, 405 U.S. at 154–55; *see also Shabazz v. Artuz*, 336 F.3d 154, 162 (2d Cir. 2003) ("Impeachment

evidence includes promises that the prosecution makes to key witnesses in exchange for their testimony.") (citing *Giglio*, 405 U.S. at 154–55).

The question of "[w]hether cooperation agreements exist between the prosecution and its witnesses is a factual determination." *Shabazz*, 336 F.3d at 161. With respect to a state court's factual findings, a federal habeas court must "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence,'" *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007), showing that "reasonable minds could not disagree" that the trial court misunderstood the factual record. *Cardoza*, 731 F.3d at 178.

B. <u>Discussion</u>

Petitioner claims that Rosado, one of the key witnesses at his trial, falsely testified that he had no expectation that his testimony in Petitioner's case would inure to his benefit in any way in Rosado's pending federal case, and that the State was aware of such an expectation and failed to disclose it. ECF No. 38 at 38–39. He raised the same claim in his second state habeas petition. ECF No. 12-15 at 16–17. In 2017, the second state habeas court declined to permit the claim to proceed to trial because it determined, "after having inspected the exhibits submitted and considering the arguments of counsel," that "the petitioner ha[d] failed to establish that evidence exists and [would] be presented at the upcoming habeas trial in support of any such argument." *See* Resp. Sec. State Habeas App. Br., Resp. App'x N, ECF No. 12-16 at 161. For the reasons stated below, the Court cannot find that the second state habeas court's determination that no such expectation existed contravened clearly established U.S. Supreme Court authority. Thus, this Court denies the petition as to this claim.

In 2017, in advance of Petitioner's first state habeas trial, the second state habeas court issued an order to show cause pursuant to Conn. Gen. Stat. § 52-470, which authorizes a state

habeas court to issue an order to show cause why some or all of a state habeas petition should be permitted to proceed to trial. *See* ECF No. 12-16 at 36–37, 41–42. When such an order is issued, a petitioner must establish "good cause" before their claim(s) may proceed to a hearing. *See* Conn. Gen. Stat. § 52-470(b). If, after evaluating the evidence and arguments submitted by the parties in alignment with the statutory obligations, the state habeas court determines that "there is not good cause for trial, the court shall dismiss all or part of the petition, as applicable." Conn. Gen. Stat. § 52-470(b)(3).

Petitioner characterized the evidence presented at the state habeas show cause hearing as follows:

> (1) testimony from a former cellmate that Rosado had indicated he was cooperating against the petitioner to attempt to curry favor with federal authorities; (2) deposition testimony from Rosado about his conversation with [State Attorney] Satti (which was confirmed at the habeas trial by Satti) about Satti's willingness to try to "work something out" with federal prosecutors; (3) Rosado's belief that Satti would likely be unable to help his federal matter but a hope that he would be able to do so, and (4) clear discussion of Rosado's criminal matter at Rosado's federal matter and a sentence that was beneath the range that Rosado testified to at the petitioner's trial.

ECF No. 29 ¶ 104. After considering such evidence, the state habeas court found that Petitioner failed to establish "that evidence exists and will be presented at the upcoming habeas trial in support of alleged facts that Man[u]el Rosado received any consideration in his federal matter in exchange for his testimony" in Petitioner's trial, "or that Man[u]el Rosado testified falsely as to any expectation of such consideration." ECF No. 12-16 at 161. The state habeas court then dismissed Petitioner's claims that relied on such alleged facts. *Id.*

In 2021, Petitioner challenged this pre-trial dismissal in his appeal of the second state habeas court's ruling. *See Lopez II App.*, 208 Conn. App. at 518 n.1. But "[a]fter a careful review of the record, as well as the parties' briefs and relevant law," the Connecticut Appellate Court also concluded that Petitioner's claims regarding an alleged expectation of consideration by Rosado

and withholding of evidence to that effect "lack[ed] merit and that the habeas court acted properly when it dismissed the claims." *Id.*

The state courts' determinations regarding the existence of any cooperation agreement, or any expectation of benefit, between the state prosecutor and Rosado are questions of fact afforded a presumption of accuracy. *See Schriro*, 550 U.S. at 473–74; *Cardoza*, 731 F.3d at 177–178. Petitioner has failed to set forth "clear and convincing evidence" that the state habeas court erred in determining that no such agreement existed. Thus, the Court cannot conclude that the presumption of validity has been rebutted or that the state courts' decisions were based on an unreasonable determination of the facts. *See Schriro*, 550 U.S. at 473–74. Petitioner's argument relies entirely on unsupported assertions that he "included enough evidence to establish a due process violation based upon the state's knowing presentation of the false testimony of Rosado." ECF No. 38 at 38. But he cites to no specific error or overlooked evidence, nor does he provide any other "clear and convincing evidence" that would rebut the presumption of correctness that this Court must afford the state courts. *See Shabazz*, 336 F.3d at 161.

To the extent Petitioner argues that the state courts' conclusion was contrary to clearly established federal law, that argument is unavailing. Petitioner posits that the habeas court incorrectly dismissed his claim as lacking supporting evidence because the "[t]he mere hope that the prosecuting authority might . . . try and do something favorable for a witness" constitutes a "tacit agreement" that should have been disclosed. ECF No. 38 at 39 (citing *Browning v. Baker*, 875 F.3d 444, 462–63 (9th Cir. 2017)). But Petitioner's authority for this proposition is not clearly established Supreme Court law, but rather part of a holding of a case in the Ninth Circuit. *Cf. Browning*, 875 F.3d at 462–63.

Moreover, Respondent has cited ample evidence to support the conclusion that the state habeas court's determination aligned with clearly established federal law. *See* ECF No. 34 at 31–37. This includes evidence of Rosado's testimony that he was under no impression that State Prosecutor Satti would provide him any assistance in his federal matter in exchange for testifying. *See id.* at 34–35. Further, Respondent convincingly argues that even if Rosado was under the impression that he would receive leniency in his federal case in exchange for his testimony in Petitioner's case, Petitioner failed to present evidence to support his assertion that the State was aware that he held that expectation and thus could have known that he testified falsely—especially where Rosado indicated that he did not expect any such consideration. *See id.* at 35–37. This evidence only serves to further bolster this Court's confidence that the state habeas court's determination regarding Rosado's alleged false testimony comported with clearly established federal law.

Accordingly, the Court denies the petition's third claim.

## VI. FOURTH CLAIM: RIGHT TO COUNSEL AT SENTENCING

The Court also rejects Petitioner's final contention—that he was denied his Sixth and Fourteenth Amendment right to counsel at sentencing when the trial court denied substitute counsel's request for a continuance so he could obtain the trial transcript before sentencing. Thus, Petitioner's request for habeas relief with respect to this claim is denied.

### A. Legal Standard

As noted above, the Sixth Amendment establishes a right to the effective assistance of counsel in all criminal prosecutions. This right extends to all critical stages of a criminal prosecution, including sentencing. *See Mempa v. Rhay*, 389 U.S. 128, 137 (1967); *see also Cronic*, 466 U.S. at 659. Generally, under the *Strickland* standard, both counsel's deficient performance

and resulting prejudice must be established to prevail on an ineffective assistance of counsel argument. *See Strickland*, 466 U.S. at 687. But where the right to counsel is denied in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," the prejudice prong need not be established. *See Cronic*, 466 U.S. at 658. Such circumstances include those "in which the surrounding circumstances ma[k]e it so unlikely that any lawyer could provide effective assistance that ineffectiveness [is] properly presumed without inquiry into actual performance at trial." *Id.* at 661. While this may include circumstances where counsel is belatedly appointed and a continuance is denied, "every refusal to postpone a criminal trial will not give rise" to a presumption of prejudice. *Id.*; *see also Morris v. Slappy*, 461 U.S. 1, 11 (1983) ("Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel."). And "broad discretion must be granted [to] trial courts on matters of continuances." *Id.* "[O]nly when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Cronic*, 466 U.S. at 661–62.

B. Discussion

Petitioner contends that that the trial court's denial of his request for a continuance to permit substitute counsel the opportunity to review the trial transcript before sentencing violated his Sixth Amendment right to counsel in a criminal proceeding. ECF No. 29 ¶¶ 109–121. For the reasons explained below, the Court cannot conclude that the Connecticut Supreme Court's determination was contrary to clearly established federal law.

In its 2007 ruling on Petitioner's direct appeal, the Connecticut Supreme Court concluded "there is no need to decide whether the trial court abused its discretion in denying the [Petitioner's]

motion for a continuance because, even if the denial was improper, it was harmless" and thus, Petitioner "was not deprived of his constitutional right to counsel." *Lopez*, 280 Conn. at 786. In determining that his right to counsel was not violated, the Connecticut Supreme Court emphasized both that trial courts must be given great discretion to manage their schedules and also that Petitioner did not argue that any prejudice stemmed from this denial. *See Lopez*, 280 Conn. at 788–89.

The determination that any error was harmless, the court found, was supported by (a) Petitioner's failure to assert any prejudice from the denial on direct appeal, (b) Petitioner's failure to identify arguments that defense counsel would have made at the sentencing had the transcript been made available, and (c) Petitioner's ability to raise any claims that may have been raised upon review of the trial transcript on direct appeal. *See id.* at 788–90. The court also determined that the denial of the requested continuance did not rise to the level of complete denial of counsel at a critical stage such that a structural error existed that precluded consideration of harmless error. *See id.* at 790–91.

Although Petitioner asserts that the Connecticut Supreme Court's failure to consider his denial of counsel argument as a *Cronic* claim of denial of counsel[22] is reversible error, this Court cannot agree. *Cronic* sets forth three limited circumstances in which a presumption of prejudice arises: (1) where the accused is denied the presence of counsel at a "critical stage"; (2) if counsel entirely fails to subject the prosecution's case to "meaningful adversarial testing"; and (3) where counsel is called upon to render assistance under circumstances where competent counsel very likely could not do so. *See Bell v. Cone*, 535 U.S. 685, 695–96 (2002) (citing *Cronic*, 466 U.S. at

[22] It is true that the Connecticut Supreme Court required Petitioner to show prejudice from the failure to grant a continuance, and did not frame his claim as one brought under *Cronic*. *See Lopez*, 280 Conn. at 790–92; *see* Crim App. Br., Resp. App'x B, ECF No. 12-4 at 28–29 (citing *Cronic*).

659–662). *Cronic* itself acknowledged that "every refusal to postpone a criminal trial will not give rise" to a presumption of prejudice. 466 U.S. at 661. Instead, it is the exception, rather than the rule, that certain circumstances so clearly result in prejudice that no such analysis is necessary. *Id.*

Although Respondent argues that there was no clearly established federal law on this issue by 2007 when the Connecticut Supreme Court decided Petitioner's direct appeal, the Court disagrees: *Cronic* sets forth circumstances in which prejudice is presumed, and need not be demonstrated by a habeas petitioner. That said, Petitioner has not adequately shown that circumstances like those described in *Cronic*, where a failure to grant a motion to continue "r[o]se to the level of complete denial of counsel," exist here. *Lopez*, 280 Conn. at 792. Counsel's inability to review the transcript "d[id] not *necessarily* render the entire process fundamentally unfair." *Id.* As the Connecticut Supreme Court concluded, the deadline to file a motion for a new trial had passed, eliminating any need for the transcript to file such a motion; counsel still had more than a month to prepare for sentencing; and any alleged infirmities could still be challenged on appeal. Upon review of the record, the Court cannot conclude that Petitioner was completely denied access to counsel at his sentencing based on the refusal to permit an extension of time. Rather, Petitioner's claim is better characterized as an ineffective assistance of counsel claim, which does require a showing of prejudice to prevail. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 146–47 (2006) (collecting cases and discussing the origins and purpose of the prejudice requirement, which requires "*effective* (not mistake-free) representation").

Thus, the Connecticut Supreme Court's determination that a showing of prejudice was necessary is not contrary to, or an unreasonable application of, clearly established federal law. And it was not unreasonable for the Connecticut Supreme Court to instead find that Petitioner's failure to establish prejudice was fatal.

For these reasons, the petition is denied as to Claim Four.

## VII. EVIDENTIARY HEARING

Finally, although Petitioner requests an evidentiary hearing "to consider the significance" of the allegedly suppressed evidence, *see* ECF No. 29 at 17, ECF No. 38 at 40–41, the Court denies that request. If "the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). *Id.* Thus, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Id*. (quoting and endorsing *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)).

Here, the Court is able to resolve the issues presented by the petition based on the state court record. Petitioner does not contend he was unable to develop the factual record in the state courts, but he believes an evidentiary hearing is needed because the state court did not consider that record as he believes it should have been considered. ECF No. 38 at 40–41. This is not an appropriate basis for an evidentiary hearing where, as here, the Court can decide the issues based on the record that was developed at the state court. Thus, Petitioner's request for an evidentiary hearing is denied.

## VIII. CONCLUSION

For the reasons described herein, Petitioner's request for habeas relief is DENIED in full. The Clerk is directed to enter judgment in favor of Respondent and close this case.

**SO ORDERED** at Hartford, Connecticut, this 29th day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE